Filed 10/22/21  P. v. Morales CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ERNESTO MORALES, JR.,<br><br>    Defendant and Appellant. | F080495<br><br>(Super. Ct. No. 1438460)<br><br><br>**OPINION** |

APPEAL from an order of the Superior Court of Stanislaus County.  Dawna Reeves, Judge.

Allen E. Junker, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Jeffrey A. White, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Eight years ago, defendant Ernesto Morales, Jr., pleaded no contest to second degree murder that was alleged to have been committed during an attempted robbery.  In

**SEE DISSENTING OPINION**

2019, defendant filed a Penal Code section 1170.95 petition for resentencing based on legislative changes to California's felony-murder rule. (Undesignated statutory references are to the Penal Code.) The People opposed the petition. The sentencing court concluded defendant had established a prima facie showing of entitlement to relief. Accordingly, the court held an evidentiary hearing after which it denied defendant's petition, concluding he was a major participant in the attempted robbery who acted with reckless indifference to human life. On appeal, defendant argues insufficient evidence supports the sentencing court's findings.

We reverse the challenged order and remand for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2012, defendant was charged by information with one count of murder (§ 187, subd. (a)) and one count of attempted robbery (§§ 211, 664). The murder was alleged to have been committed under special circumstances, i.e., while defendant was aiding and abetting a principal in the attempted commission of a robbery. (§ 190.2, subd. (a)(17)(A).) Both counts included firearm enhancement allegations pleaded pursuant to section 12022, subdivision (a)(1).

In 2013, the parties entered into a plea agreement. The terms called for defendant's plea of no contest and full cooperation in the People's case against the actual killer in exchange for (1) a conviction of second degree murder, (2) a stipulated sentence of 15 years to life in prison, and (3) dismissal of all remaining charges and allegations. At the change of plea hearing, the prosecutor confirmed the People's theory of liability was felony murder. On August 14, 2014, defendant was sentenced in accordance with the plea deal.

On March 26, 2019, defendant filed a petition for resentencing pursuant to section 1170.95. Using a preprinted form that listed the statutory requirements, he attested to having pleaded guilty or no contest to first or second degree murder in lieu of going to

2.

trial because he believed he could have been convicted of first or second degree murder at trial pursuant to the felony-murder rule or the natural and probable consequences doctrine. Defendant further claimed he could not now be convicted of first or second degree murder because of changes made to sections 188 and 189, effective January 1, 2019.

In August 2019, defendant was found to have made a prima facie showing of entitlement to relief based on amendments to sections 188 and 189 made by Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437). Accordingly, the sentencing court issued an order to show cause and scheduled an evidentiary hearing. Defendant personally appeared at the hearing but did not testify. The People elicited testimony from Sergeant Darwin Hatfield of the Stanislaus County Sheriff's Department.

Sergeant Hatfield testified he was involved in the investigation of the December 4, 2009, murder of the victim, Harjinder Sanghera. He explained he interviewed defendant as part of the investigation, and the court admitted a transcript of defendant's interview as an exhibit. The People then asked the court to take judicial notice of the preliminary hearing transcript and "the other procedural matters in this case, the plea agreement, and the September 17, 2013 ruling on the [section] 1385 motion filed on the special circumstance." Defense counsel did not present any evidence. The People acknowledged it was undisputed defendant was not the killer and "there is not substantial evidence that he had any intent to kill." So, the issue turned upon whether he was a major participant who acted with reckless disregard for human life.

In defendant's interview with police he explained Mark Burgess, the coparticipant in the offense, was his brother-in-law's cousin; Burgess stayed with defendant "for a little bit because he had nowhere else to stay." When the detective asked defendant what he knew about Burgess's arrest history, defendant said Burgess had told him "all kinds of stuff," including that "[h]e fought some murder case in Arizona." According to defendant, Burgess told him with regard to the murder case that he, "his brother and some

3.

more family members were arrested, but it turned out being a false imprison [*sic*] or something, and it was wrong"; someone had framed them.

With regard to the attempted robbery, defendant told the detective Burgess arrived at defendant's house in Merced early that morning and convinced defendant to go to Modesto with him. Defendant reported he knew they were going to do a robbery when they left Merced to go to Modesto, but he did not know "anything bad was going to happen." According to defendant, he did not want to participate in the crime. Defendant thought Burgess "was bluffing" and would "drop it" once they "got to the door."

Defendant, Burgess, and Burgess's brother, Michael, were in the car. They parked outside the convenience store for approximately an hour or two during which time they figured out who would go into the store. Michael did not want to go in and defendant told them he did not want to do it either. Burgess wanted defendant to hold the gun, but defendant said "no," "I don't really want to do this, man," and that he "kind of want[ed] to go home."

Ultimately, defendant covered his face with a shirt and went in with Burgess; Burgess held the gun, a revolver. Defendant told the store clerk to "Give up the money," but the clerk did not comply. The clerk leaned down, and "[i]t looked like he was pulling out a gun" or "was trying to get something" from behind the counter. Burgess then shot the clerk twice in his side or back. Defendant did not see the clerk fall to the ground, but instead saw him leaning on the counter after Burgess shot him. Burgess and defendant ran back to the car without getting any money. Defendant did not know what happened to the gun. He explained Burgess and Burgess's brother obtained the gun a week before the attempted robbery.

The court took the matter under submission and later denied defendant's petition by written order. In the order, the court held defendant was "ineligible for resentencing pursuant to … section 1170.95 because he was a major participant in the attempted robbery and acted with reckless indifference for human life. As such, [he] could be

4.

convicted of murder after the January 1, 2019 changes to … sections 188 and 189." The court noted that the facts surrounding the December 4, 2009, attempted robbery giving rise to defendant's conviction were undisputed. The court then detailed the following facts taken from defendant's interview with police:

"1. Burgess was an extended relative that lived with [defendant] when Burgess had nowhere else to go.…

"2. [Defendant] believed that Mark Burgess had been accused of Murder in the state of Arizona.…

"3. [Defendant] was aware that Mark Burgess had been released from prison.…

"4. Burgess told [defendant] 'all kinds of stuff' about his arrest history[.]…

"5. [Defendant] knew that Burgess obtained a gun a week prior to the robbery.…

"6. [Defendant] was aware that the gun was obtained by nefarious means.…

"7. When Burgess approached [defendant] in the early morning and asked him to go to Modesto, Burgess was saying 'crazy stuff' and [defendant] tried to agree.…

"8. Burgess, [defendant] and a third man drove together to Modesto from Merced County to rob the store.…

"9. [Defendant] was aware that a gun would be used to effectuate the robbery and the gun was shown to him.…

"10. [Defendant] participated in the discussion about who would enter the store and who would use the gun.…

"11. [Defendant] agreed to enter the store with the gunman. The third man waited in the car.…

"12. Upon entry into the store, [defendant] covered his face with a t-shirt.…

"13. [Defendant] demanded money from the clerk.…

"14. The clerk did not want to comply with [defendant]'s demand.…

"15. When it appeared that the clerk was reaching for something, Burgess shot the clerk twice.…

"16. [Defendant] saw the wounded clerk lean onto a counter but did not see the clerk fall.…

"17. [Defendant] and Burgess ran together to a hole in the fence after the shooting.…

"18. After the incident, [defendant] tried to stop talking to the Burgess [*sic*].…

"[Defendant] was present and participated in the discussions and preparation preceding the attempt to rob the clerk. [Defendant] took an active and primary role in the execution of the robbery attempt. It was [defendant] who entered the store, covered his face, and demanded money from the clerk. [Defendant] was clearly a major participant in the attempted robbery.

"There is significant overlap between being a major participant and having acted with reckless indifference to human life. The greater the participation in the felony, the more likely it is that one acts with reckless indifference to human life. ([*People v. Clark* (2016) 63 Cal 4th 522, 614-615]). Here, [defendant] was subjectively aware of the grave risks involved in moving forward with the robbery.

"[Defendant] was familiar with Burgess, having lived with him. Burgess told [defendant] 'lots of things' about his criminal background, including allegations of murder in Arizona and a term in state prison. [Defendant] knew that a gun had been obtained and he was familiar with when and from whom it was acquired. [Defendant]'s familiarity with the details of the acquisition of the firearm supports the conclusion that he participated in the planning stages of the robbery. He was not an uninformed participant or passive bystander. [Defendant] also was physically present with Burgess during the hours preceding the robbery. [Defendant] observed that Burgess was saying 'crazy stuff' the morning of the robbery. Although [defendant] had ample opportunity to act as a restraining influence, instead he 'tried to agree' with Burgess. During the hours leading up to the events that resulted in the killing of the store clerk, [defendant] had the opportunity to observe Burgess's behavior, consider

what he knew or believed about Burgess's background and the progressing plan to conduct a violent robbery.

"Despite having an extended opportunity to reflect on what they were planning, [defendant] ignored the risks involved in robbing the store with Burgess armed with a loaded gun. [Defendant] willingly chose to personally confront the clerk with a covered face and demand money while accompanied by an armed felon. [Defendant] took no steps before the attempted robbery to minimize the risk of death or injury. Following the fatal shots, [defendant] did nothing to summon aid or assist the wounded clerk, choosing instead to flee with Burgess, leaving the clerk in peril. Before, during and after the robbery attempt, [defendant] was subjectively aware of the grave risk of death involved and chose to ignore them [*sic*]. These circumstances establish beyond a reasonable doubt that [defendant] was a major participant in the attempted robbery and acted with reckless disregard for the life of the store clerk."

## DISCUSSION

Defendant challenges the denial of his petition for resentencing. We agree the sentencing court's order is not supported by substantial evidence. Accordingly, we reverse it and remand for further proceedings.

### 1. Senate Bill 1437 and Section 1170.95

On September 30, 2018, the Governor signed Senate Bill 1437, which became effective on January 1, 2019. Senate Bill 1437 "amend[s] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) It amends section 188, which defines malice, and section 189, which defines the degrees of murder to address felony-murder liability, and it adds section 1170.95, which provides a procedure by which those convicted of murder can seek retroactive relief if the changes in the law would affect their previously sustained convictions. (Stats. 2018, ch. 1015, §§ 2–4.)

Section 1170.95 permits those "convicted of felony murder or murder under a natural and probable consequences theory [to] file a petition with the court that sentenced

7.

the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts …." (*Id.*, subd. (a).) An offender may file a petition under section 1170.95 where all three of the following conditions are met:

> "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;] [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a)(1)–(3).)

A trial court receiving a petition under section 1170.95 "shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section." (§ 1170.95, subd. (c).) If the petitioner has made such a showing, the trial court "shall issue an order to show cause." (*Ibid*.) The trial court must then hold a hearing "to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not been previously been [*sic*] sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1170.95, subd. (d)(1).)

## 2.    Standard of Review

On appeal from a denial of relief following an evidentiary hearing under section 1170.95, subdivision (d), we review the sentencing court's factual findings for substantial evidence. (*People v. Clements* (2021) 60 Cal.App.5th 597, 618, review granted Apr. 28, 2021, S267624; accord, *People v. Lopez* (2020) 56 Cal.App.5th 936, 954, review granted Feb. 10, 2021, S265974 [substantial evidence standard of review applies to postjudgment orders involving judicial factfinding]; *People v. Rodriguez* (2020) 58 Cal.App.5th 227, 238, review granted Mar. 10, 2021, S266652 [same].) Under that familiar standard, "'we review the entire record in the light most favorable to the judgment to determine whether

it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt'" under section 188 as amended. (*People v. Morales* (2020) 10 Cal.5th 76, 88; *Clements*, *supra*, at p. 618.) To that end, we presume the existence of every fact the court as factfinder could reasonably deduce from the evidence in support of the court's order. (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 626.)

**3.      Applicable Law**

Section 190.2 "identifies the circumstances under which murderers and accomplices can be punished by death or life imprisonment without parole.… For defendants who did not kill and lacked the intent to kill, section 190.2, subdivision (d) permits such punishment only if they acted 'with reckless indifference to human life and as a major participant' [in] a qualifying felony like robbery." (*People v. Douglas* (2020) 56 Cal.App.5th 1, 7; see *In re Scoggins* (2020) 9 Cal.5th 667, 674 (*Scoggins*).) By incorporating this requirement, section 190.2 codified the holdings of *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) and *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*), bringing California law "into conformity with prevailing Eighth Amendment doctrine." (*In re Ramirez* (2019) 32 Cal.App.5th 384, 393 (*Ramirez*); accord, *People v. Clark*, *supra*, 63 Cal.4th at p. 609 (*Clark*); *People v. Estrada* (1995) 11 Cal.4th 568, 575; *In re McDowell* (2020) 55 Cal.App.5th 999, 1004.) Section 190.2 thereby requires courts to "examine the defendant's *personal* role in the crimes leading to the victim's death and weigh the defendant's individual responsibility for the loss of life, not just his or her vicarious responsibility for the underlying crime." (*People v. Banks* (2015) 61 Cal.4th 788, 801 (*Banks*).)

*Enmund* held the death penalty could not constitutionally be imposed on an armed robbery getaway driver who was a minor participant in the crime, was not present when the murder was committed, and had no intent to kill or any culpable mental state.

(*Enmund*, *supra*, 458 U.S. at pp. 798, 801; *Scoggins*, *supra*, 9 Cal.5th at p. 675.) The *Enmund* court noted the record did not warrant a finding the defendant "had any intention of participating in or facilitating a murder." (*Enmund*, at p. 798.)

*Tison*, in contrast, did not preclude imposition of the death penalty for two defendants, brothers who had helped their father and his cellmate—both convicted murderers—escape from prison. (*Tison*, *supra*, 481 U.S. at pp. 139, 151–152.) The brothers locked up the prison guards and armed the two prisoners during the escape. (*Id.* at p. 139.) A few days later, the group's vehicle got a flat tire. (*Ibid.*) One of the brothers flagged down a passing car for help. (*Id.* at pp. 139–140.) The group then kidnapped at gunpoint the family of four in the car, robbed them, and drove them into the desert. (*Id.* at p. 140.) The sons stood by while the father and cellmate shot the victims repeatedly. (*Id.* at p. 141.) The perpetrators left the family—which included a toddler and a teenager—to die in the desert and drove off in the family's car. (*Id.* at pp. 139–141.) *Tison* held the Eighth Amendment does not prohibit imposition of the death penalty on a nonkiller who lacked the intent to kill, but whose "participation [in the crime] is major and whose mental state is one of reckless indifference to the value of human life." (*Id.* at pp. 152, 157–158.)

*Enmund* and *Tison* helped define the constitutional limits for punishing accomplices to felony murder and established a "'spectrum of culpability,'" with felony murderers who "'actually killed, attempted to kill, or intended to kill'" at one end, and the minor actors who were not present at the scene and who neither intended to kill nor had any culpable mental state at the other end. (*Scoggins*, *supra*, 9 Cal.5th at p. 675; see *Banks*, *supra*, 61 Cal.4th at pp. 794, 800; *In re Loza* (2017) 10 Cal.App.5th 38, 46.) "Somewhere between them, at conduct less egregious than the Tisons' but more culpable than … Enmund's, lies the constitutional minimum" required for the imposition of a sentence of death or life without the possibility of parole. (*Banks*, *supra*, at p. 802.) *Tison* and *Enmund* did not establish a ceiling or a floor for determining when an aider and

abettor is eligible for such a sentence, however.  (*In re Miller* (2017) 14 Cal.App.5th 960, 974, fn. 4; *In re Bennett* (2018) 26 Cal.App.5th 1002, 1014, fn. 4.)  The fact a particular defendant appears more culpable than Enmund does not automatically make him death eligible; conversely, neither must a defendant be as culpable as the Tison brothers in order for section 190.2, subdivision (d) to apply.  The question is one of degree.  (*Miller*, at p. 974, fn. 4; *Bennett*, at p. 1014, fn. 4.)

In *Banks* and *Clark*, our state Supreme Court clarified the meaning of the "major participant" and "reckless indifference to human life" requirements.  *Banks* considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant."  (*Banks*, *supra*, 61 Cal.4th at p. 794.)  The court listed various factors to be considered in making that determination:

> "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?"  (*Id.* at p. 803, fn. omitted.)

*Banks* found insufficient evidence to show the defendant there—a getaway driver for an armed robbery—was a major participant or acted with reckless indifference. (*Banks*, *supra*, 61 Cal.4th at pp. 805, 807–808.)  No evidence established his role in planning the robbery or procuring the weapons; during the robbery and murder he was absent from the scene, sitting in a car and waiting; and no evidence showed he had any role in instigating the shooting, or could have prevented it.  (*Id.* at pp. 805–807.)  He was "no more than a getaway driver," like Enmund.  (*Id.* at p. 805.)

The following year, in *Clark*, the court further addressed the "reckless indifference" determination.  (*Clark*, *supra*, 63 Cal.4th at pp. 610–623.)  "[T]he necessary

11.

mens rea … may be 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.'" (*Id.* at p. 616, quoting *Tison*, *supra*, 481 U.S. at p. 157.) It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, *supra*, at p. 617.)

Reckless indifference to human life has both a subjective and an objective component. (*Clark*, *supra*, 63 Cal.4th at p. 617.) Subjectively, "'[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.'" (*Banks*, *supra*, 61 Cal.4th at p. 801; see *Clark*, at p. 617.) Objectively, "'[t]he risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.'" (*Clark*, at p. 617, quoting Model Pen. Code, § 2.02, subd. (2)(c); accord, *Scoggins*, *supra*, 9 Cal.5th at p. 677.)

The *Clark* opinion reiterates a point made in *Banks*: "The mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life." (*Clark*, *supra*, 63 Cal.4th at p. 618, citing *Banks*, *supra*, 61 Cal.4th at p. 809.) The opinion also provides a list of factors to be considered in determining whether a defendant acted with such reckless indifference:

> "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins*, *supra*, 9 Cal.5th at p. 677 [listing factors set forth in *Clark*, *supra*, 63 Cal.4th at pp. 618–623].)

12.

Based on these factors, *Clark* concluded the defendant there did not act with reckless indifference to human life. (*Clark*, *supra*, 63 Cal.4th at p. 623.) The *Clark* defendant was the "mastermind" who planned and organized a computer store robbery and waited across from the store's parking lot while his accomplices carried it out. (*Id.* at pp. 612, 619.) His plan called for the robbery to take place after the store closed when there would be fewer people present, for any remaining employees to be handcuffed, and for the use of a single, unloaded gun. (*Id.* at pp. 613, 620–622.) However, during the robbery the mother of one of the employees—who had come to pick him up from work— entered the store, surprising the robbers, and Clark's accomplice shot her. (*Id.* at p. 539.) As police cars arrived, Clark fled the scene, leaving the shooter behind. *Clark* concluded the defendant—who was not armed, was not physically present in the store when the shooting occurred, did not have the intent to kill, and attempted to minimize the likelihood of violence by timing the robbery when fewer people would be present and using an unloaded gun—did not act with reckless indifference to human life. (*Id.* at pp. 611, 618–623.)

Most recently, our Supreme Court considered the reckless indifference inquiry in *Scoggins*, *supra*, 9 Cal.5th 667. *Scoggins* found an insufficient showing of reckless indifference where the defendant planned an unarmed assault and robbery in which one of the accomplices deviated from the contemplated plan and unexpectedly killed the victim. (*Id.* at p. 671.) There, the defendant had been swindled by the victim in the purchase of three television sets. (*Ibid.*) In response, the defendant recruited two close friends to ambush the victim and "'beat the shit'" out of him and get the defendant's money back, while the defendant waited at a nearby gas station. (*Id.* at pp. 671, 678.) When the victim arrived, one of the friends pulled out a gun and shot him. (*Id.* at p. 672.) In concluding the evidence was insufficient to establish the defendant acted with reckless indifference, the *Scoggins* court considered that he was not present at the scene of the murder, was not in a position to restrain his accomplices, did not know a gun would be

13.

used or that the victim would be killed, attempted to minimize the risk of death by ordering the assault to occur in a public place in broad daylight, and acted ambiguously after the shooting. (*Id.* at pp. 677–683.)

After the passage of Senate Bill 1437, section 189, subdivision (e)(3) now provides that a participant in a robbery where a death occurs may be liable for murder if the person was "a major participant in the [robbery] and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." Because the factors articulated by the California Supreme Court in *Banks*, *Clark*, and *Scoggins* construe the language in section 190.2, subdivision (d), which the Legislature incorporated into section 189, subdivision (e), these factors apply when determining a defendant's eligibility for relief under section 1170.95 as a person convicted of felony murder. (*In re Taylor* (2019) 34 Cal.App.5th 543, 561; see *People v. Gutierrez-Salazar* (2019) 38 Cal.App.5th 411, 419 [because "[t]he language of the special circumstance tracks the language of Senate Bill 1437 and the new felony-murder statutes," a jury's true finding on § 190.2, subd. (d) renders a § 1170.95 petitioner ineligible for relief].) Thus, we look to these factors in reviewing for substantial evidence a court's finding that a defendant was a major participant who acted with reckless indifference to human life.

4.      **Analysis**

Defendant argues he was not a major participant in the crime and did not act with reckless indifference to human life. The People dispute both contentions. We agree with defendant on the issue of mens rea and therefore do not analyze whether he was a major participant. (See *Clark*, *supra*, 63 Cal.4th at p. 614 ["we need not decide whether, under the circumstances of this case, defendant was a major participant … because, as discussed below, we conclude that the evidence was insufficient to support that he exhibited reckless indifference to human life"].)

Defendant apparently had some degree of involvement in planning the underlying felony. That much is inferable from his admission of sitting in a parked car with the Burgess brothers, "down the street" from the gas station/convenience store, for an "hour or two" prior to the attempted robbery. But as far as the evidence reveals, the extent of defendant's input was "just trying to figure out who was going to go in there" and which person would carry the gun.[1]

To impose murder liability on an accomplice for being a planner or organizer, "the plan must have some aspect 'that elevated the risk to human life beyond those risks inherent in any armed robbery.'" (*In re Taylor*, *supra*, 34 Cal.App.5th at p. 557, quoting *Clark*, *supra*, 63 Cal.4th at p. 623.) "[A]ny person who plans or participates in an *armed* robbery can be said to anticipate that lethal violence might be used …. But that fact, without more, does not establish reckless indifference to human life." (*Scoggins*, *supra*, 9 Cal.5th at p. 682.)

In *Ramirez*, our district found insufficient evidence of a culpable mental state despite proof the appellant "supplied the guns that ultimately were used in the attempted robbery and murder" and "knew the guns were loaded and operable." (*Ramirez*, *supra*, 32 Cal.App.5th at p. 404.) "[T]here was no evidence the killing was planned or even contemplated," nor evidence the appellant "was involved in any planning beyond agreeing the group should [rob] someone, after which he simply acquiesced in whatever

---

[1]Our dissenting colleague suspects defendant had a more prominent role in planning the crime, but the theory rests on speculation. If there was evidence defendant played a larger role than he was willing to admit, it was the prosecution's burden to present such evidence. (See § 1170.95, subd. (d)(3) ["the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing"].) While a trier of fact may reject the evidence presented, such as defendant's statements about having been reluctant to participate in the attempted robbery, it may not reasonably infer the opposite, i.e., that because defendant "repeatedly downplayed his role" it can be assumed he masterminded the plan or instigated the offense. It is not enough to hypothesize about events that may or may not have taken place. Again, the burden of proof was on the People. Defendant was not obligated to explain purported gaps in the evidence.

[the killer] said to do." (*Ibid*.) Here, it is undisputed defendant did *not* supply the gun used in the attempted robbery. There is also a lack of evidence defendant knew the gun was loaded and operable. Moreover, there is no evidence defendant or his confederates planned in advance to use physical violence during the offense.

The People argue defendant "knew about the firearm, knew how it had been obtained, and knew that it was in the hands of a felon who had previously been implicated in a murder." We have already addressed the first point. Accomplices "who simply had awareness [(1)] their confederates were armed and [(2)] armed robberies carried a risk of death, lack the requisite reckless indifference to human life." (*Banks*, *supra*, 61 Cal.4th at p. 809.)

The statement regarding how the gun was obtained alludes to the trial court's finding it was procured "by nefarious means." The trial court cited to defendant's police interview, wherein he claimed the Burgess brothers acquired the gun from "a Norteño gang member." Frankly, the latter detail is irrelevant. The crime would not have posed less of a threat to human life had the gun been obtained from a more reputable individual. (Cf. *Ramirez*, *supra*, 32 Cal.App.5th at p. 405 [being aware one of his cohorts is a gang member "says nothing about [the appellant's] knowledge of his cohorts' likelihood of killing"].)

The People's third argument relies on this statement in *Clark*: "A defendant's willingness to engage in an armed robbery with individuals known to him to use lethal force may give rise to the inference that the defendant disregarded a 'grave risk of death.'" (*Clark*, *supra*, 63 Cal.4th at p. 621.) The *Tison* case exemplifies this principle. "[T]he Tison brothers brought an arsenal of lethal weapons into the prison which they then handed over to two *convicted* murderers, one of whom the brothers *knew* had killed a prison guard in the course of a previous escape attempt." (*Clark*, at p. 621, italics added, citing *Tison*, *supra*, 481 U.S. at p. 151.) The brothers also "had advance notice of the possibility that their father would shoot the [victims] because, in response to one of

16.

the victim's plea not to be killed, the father stated that he 'was "thinking about it."'"" (*Ibid.*)

The People's allegation that Burgess "had previously been implicated in a murder" is derived from this segment of defendant's police interview:

"DETECTIVE:  You know what [Burgess has] ever been arrested before for?

"[DEFENDANT]:  Yeah, he told me all kinds of stuff.

"DETECTIVE:  Like what?

"[DEFENDANT]:  He fought some murder case in Arizona.

"DETECTIVE:  He fought a murder case in Arizona?

"[DEFENDANT]:  And I guess he beat it and he came down here, him and his brother.

"DETECTIVE:  He tell you what happened on that murder case?

"[DEFENDANT]:  He said that him and his brother and some more family members were arrested, but it turned out being a false imprison or something, and it was wrong.

"DETECTIVE:  Wrong identity?

"[DEFENDANT]:  Yeah.  Or somebody framed him, something like that."

We do not share the dissent's view that defendant's statements were inconsistent insofar as he believed Burgess had "beat" the charge based on circumstances of mistaken identity or because he had been framed.  Regardless, the evidence does not show Burgess was a person "known to him to use lethal force."  (*Clark*, *supra*, 63 Cal.4th at p. 621.) The evidence shows defendant believed Burgess had once been accused of murder; it does not establish his personal knowledge of the surrounding facts.  The only evidence of the story's effect on defendant is that he believed the murder allegation was unfounded.

Defendant's belief Burgess had served time in prison likewise fails to demonstrate an awareness of Burgess's "propensity for violence." (*Clark*, *supra*, 63 Cal.4th at p. 621.) A general history of criminality—"even if known to [the appellant]—does not, contrary to the Attorney General's claim, 'fairly support an inference that [the appellant] would have expected his armed confederates to use deadly force.'" (*Ramirez*, *supra*, 32 Cal.App.5th at p. 405, quoting *Banks*, *supra*, 61 Cal.4th at pp. 810–811; accord, *In re Taylor*, *supra*, 34 Cal.App.5th at p. 558.) In *Miller*, for example, the appellant and the killer belonged to the same gang and had committed robberies together in the past, but there was no evidence they had ever participated in shootings or other crimes involving deadly force. (*In re Miller*, *supra*, 14 Cal.App.5th at p. 976.) The *Miller* court held neither the shared criminal history nor "evidence that [the killer] regularly used PCP, including on the day he killed [the victim]," supported an inference the appellant knew his fellow gang member "was likely to kill." (*Ibid.*)

Quoting from *In re Parrish* (2020) 58 Cal.App.5th 539, 544, the dissent argues defendant knew the Burgess brothers "were not peaceable or cautious." The case is distinguishable, and we are thus unpersuaded. The *Parrish* appellant helped to plan a robbery; he "scouted" the targeted business in advance; he supplied one of the firearms used in the offense; he drove himself and two accomplices to and from the crime scene; he "enter[ed] the store as part of the robbery team"; and he actively participated in the robbery. (*Id.* at pp. 541, 543.) Most critically, he "heightened the risk by telling those with guns the store owner was pushing a police alarm—an act that immediately preceded and apparently prompted the deadly shot." (*Id.* at p. 544.)

It was the People's burden to show defendant "knew *his own actions* would involve a grave risk of death." (*Banks*, *supra*, 61 Cal.4th at p. 807, italics added.) We acknowledge this case is distinguishable from *Banks*, *Clark*, *Scoggins*, and others cited herein because of defendant's presence during, and participation in, the attempted robbery. (See *People v. Garcia* (2020) 46 Cal.App.5th 123, 148 ["Presence at the scene

18.

of the murder is a particularly important aspect of the reckless indifference inquiry"].) However, the California Supreme Court has said "the fact of the use of a gun" establishes nothing more than "'a garden-variety armed robbery'" (*Clark*, *supra*, 63 Cal.4th at p. 617, fn. 74), which is an inherently dangerous crime (*id*. at p. 623). The fact defendant was unarmed and was never shown to have handled the murder weapon is a circumstance weighing in his favor. (See *id*. at p. 618 ["A defendant's *use* of a firearm, even if the defendant does not kill the victim …, can be significant to the analysis of reckless indifference to human life"].)

Although our Supreme Court declined to "set up a judicial standard for what constitutes a typical armed robbery" (*Clark*, *supra*, 63 Cal.4th at p. 617, fn. 74), it is safe to say that entering a store, covering one's face, and making a verbal demand for money are all generic circumstances. We therefore conclude no aspect of defendant's participation in the crime was shown to have "elevated the risk to human life beyond those risks inherent in any armed robbery." (*Id.* at p. 623.)

There remains a question of whether defendant's presence gave him "'an opportunity to act as a restraining influence'" on Burgess. (*Clark*, *supra*, 63 Cal.4th at p. 619.) The People and our dissenting colleague fault defendant for not dissuading Burgess from attempting the robbery in the first place. However, the case law focuses on what an accomplice could have done once a crime was in progress. (See, e.g., *Scoggins*, *supra*, 9 Cal.5th at p. 678, discussing *Tison*, *supra*, 481 U.S. at pp 139–141 [using the phrase "restrain the crime" in reference to the murder itself, not the crimes of kidnapping and robbery that were already in progress]; *People v. Garcia*, *supra*, 46 Cal.App.5th at pp. 147-148 [reckless indifference shown by 40-minute period during which appellant saw a robbery victim "being bound and beaten" but "did not restrain the actions of his accomplices or check on the condition of his victims as he went about ransacking the house"]; *In re Loza*, *supra*, 10 Cal.App.5th at p. 54 [failure to intervene when killer "counted down" while threatening to shoot two store clerks]; *People v. Smith* (2005) 135

19.

Cal.App.4th 914, 921, 927 [failure to intervene "during the many tumultuous minutes" that passed as killer stabbed and slashed the victim 27 times with a knife, repeatedly hit her in the face with a steam iron, and slammed her head through a wall].)  "[W]here a defendant 'lacked control over' the actions of his or her confederates 'once they arrived on the crime scene, especially given how quickly the shooting occurred,' and never instructed his or her confederates to kill the victim 'under any scenario,' that defendant is less culpable because he or she lacked the ability to restrain the crime."  (*In re Moore* (2021) 68 Cal.App.5th 434, 449.)

A closely related factor to presence is "[t]he duration of the interaction between victims and perpetrators."  (*Clark*, *supra*, 63 Cal.4th at p. 620.)  "Where a victim is held at gunpoint … or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder."  (*Ibid.*)  Here, the evidence can only be construed as showing the events unfolded rapidly.  The record does not show defendant had a meaningful opportunity to intervene before the attempted robbery turned into a murder.  (See *Scoggins*, *supra*, 9 Cal.5th at p. 681 ["only a brief conversation" preceded the shooting; the estimated duration of "between a few seconds and three to five minutes" was not a "prolonged period" and did "not weigh in favor of finding that [appellant] exhibited reckless indifference"]; *In re Taylor*, *supra*, 34 Cal.App.5th at p. 558 [no reckless indifference where shooting appeared to be "a 'somewhat impulsive' response to the victim's unexpected resistance"]; cf. *In re Loza*, *supra*, 10 Cal.App.5th at p. 54 [appellant "could have done any number of things to intercede" during the killer's five-second countdown to the shooting, "e.g., yell at [him] to stop, try to halt the countdown, demand that they leave, distract [him], or attempt to calm [him down]"].)

The last factor is defendant's behavior after the shooting occurred.  "[A]ppellate courts have considered relevant a defendant's failure to provide aid while present at the scene."  (*Clark*, *supra*, 63 Cal.4th at p. 619.)  In *Tison*, for example, the perpetrators left

20.

injured victims stranded in the desert with no means of summoning help and virtually no chance of being found alive. (*Tison*, *supra*, 481 U.S. at pp. 139–141.)

Defendant fled the crime scene without making any effort to aid or summon help for the injured victim. Those actions reflect poorly upon him, but the circumstances differ from those as in cases like *Tison*. The attempted robbery was committed at a gas station in the middle of the afternoon. Defendant claimed he and Burgess fled "as soon as the shots happened," and he last saw the victim leaning on the counter. The evidence does not show defendant knew the extent of the victim's injuries or whether the victim was capable of summoning aid for himself, e.g., using a phone to call 911. Although certainly of lesser significance, the location and time of day increased the likelihood of a third party discovering the victim in time to render aid or call for help.

Furthermore, the California Supreme Court has held "that when different inferences may be drawn from the circumstances, the defendant's actions after the shooting may not be very probative of his mental state." (*Scoggins*, *supra*, 9 Cal.5th at p. 679.) "For example, if those actions 'might indicate [either] that [the defendant] had anticipated the use of lethal force' or 'that he had not planned for his accomplices to kill' the victim, they 'do not weigh substantially in favor of a finding of reckless indifference to human life.'" (*In re Moore*, *supra*, 68 Cal.App.5th at p. 450, quoting *Scoggins*, at p. 680.)

A classic example of reckless indifference is "'the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property.'" (*Clark*, *supra*, 63 Cal.4th at p. 616, quoting *Tison*, *supra*, 481 U.S. at p. 157.) Yet defendant and Burgess both fled without taking money from the open drawer of the store's cash register. The People concede defendant "seemed to abandon the robbery plan after the shooting." The fact both perpetrators immediately departed without taking any money strongly suggests (1) neither party anticipated the gun would be fired, (2) the

shooting was an impulsive and spontaneous act by Burgess, and (3) both men panicked when what was supposed to be a garden-variety armed robbery suddenly went awry. (Cf. *People v. Douglas* (2020) 56 Cal.App.5th 1, 4, 10–11 [no evidence shooting came as a surprise and, after seeing store clerk "on the floor shaking" from a gunshot wound, appellant "'went outside to look around,'" returned to the store, stole money from the cash register, "then emptied [the clerk's] pockets while the clerk lay on the ground with blood pooling around his head"].)

Our use of the term "garden-variety" is not intended to minimize the tragic loss of life in this case. The issue is whether defendant had a culpable mental state, and the California Supreme Court "has emphasized that the planning of or participation in a felony, even one in which the perpetrators were armed, is not by itself sufficient to show reckless indifference." (*In re McDowell* (2020) 55 Cal.App.5th 999, 1013, citing *Scoggins*, *supra*, 9 Cal.5th at p. 682 and *Clark*, *supra*, 63 Cal.4th at pp. 613–623.) "The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Banks*, *supra*, 61 Cal.4th at p. 801.)

As explained, the evidence does not show defendant's own behavior "elevated the risk to human life beyond those risks inherent in any armed robbery." (*Clark*, *supra*, 63 Cal.4th at p. 623.) Likewise, his "actions after the shooting do not weigh substantially in favor of a finding of reckless indifference to human life." (*Scoggins*, *supra*, 9 Cal.5th at p. 680.) Therefore, based on the totality of the circumstances as viewed in the light most favorable to the People, we conclude there is insufficient evidence to support the denial of relief under section 1170.95.

On remand, defendant's murder conviction must be vacated. Since there are no remaining counts, the conviction "shall be redesignated as the … underlying felony for resentencing purposes." (§ 1170.95, subd. (e); see *People v. Watson* (2021) 64 Cal.App.5th 474, 484, fn. 5 ["As the parties do not dispute that [appellant] was convicted

22.

of murder under a felony-murder theory, we focus on the phrase 'underlying felony'"].) Determining the underlying felony and punishment for the same are left to the discretion of the sentencing court. (See *Watson*, at pp. 484-492; *People v. Howard* (2020) 50 Cal.App.5th 727, 739 ["the Legislature intended to grant the trial court flexibility when identifying the underlying felony for resentencing under subdivision (e)"].)

## DISPOSITION

The trial court's order denying relief under section 1170.95 is reversed for insufficient evidence of reckless indifference to human life. The matter is remanded for further proceedings consistent with this opinion.

PEÑA, J.

I CONCUR:


MEEHAN, J.

23.

POOCHIGIAN, Acting P.J., Dissenting.

I respectfully dissent from the majority opinion's determination that there is insufficient evidence to support the trial court's findings that defendant acted with reckless indifference to human life, and the conclusion that he is entitled to relief under Penal Code section 1170.95 from his conviction for second degree murder.

In doing so, I am mindful of the constitutional " 'spectrum of culpability' " for defendants in such cases, that range from being " 'the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have any culpable mental state' [citation]," to " 'the felony murderer who actually killed, attempted to kill, or intended to kill.' [Citation.]" (*In re Scoggins* (2020) 9 Cal.5th 667, 675 (*Scoggins*).)

I would find substantial evidence in the record supports the trial court's factual findings on both the major participant and reckless indifference determinations, as the terms are defined in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), since these requirements "significantly overlap …, for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life." (*Tison v. Arizona* (1987) 481 U.S. 137, 153 (*Tison*).)

While defendant was not the gunman or a getaway driver, I believe there is substantial evidence that he was far more than " 'the minor actor in an armed robbery.' " (*Scoggins, supra*, 9 Cal.5th at p. 675.) He was instrumental in planning and directly perpetrating the attempted robbery that led to the clerk's death. By his own admission, he spent a substantial period of time talking with Mark Burgess (Mark) and Michael Burgess (Michael) about how they would commit the robbery.[1] Defendant agreed to commit the robbery with Mark instead of insisting on driving the getaway car or walking

---

[1] The Burgess brothers will be referred to by their first names to avoid confusion; no disrespect is intended.

away from the entire incident; he covered his face; he confronted the clerk; he demanded the money; he was present when Mark fatally shot the clerk; he did nothing to help the wounded clerk; and he remained silent for nearly two years until he was taken into custody and confronted with Mark's statements implicating him.

**The credibility of defendant's statements**

In determining defendant's culpability under *Banks* and *Clark*, the California Supreme Court has "prescribe[d] a fact-intensive and individualized inquiry to determine whether the defendant's culpability was major or minor. [Citations.]" (*In re Parrish* (2020) 58 Cal.App.5th 539, 542 (*Parrish*).)

Defendant entered a plea to the murder charge, and his statements to Detective Hatfield during his November 2011 interview constitute the only evidence that was admitted into this record about his participation in the attempted robbery and murder.[2]

While defendant repeatedly downplayed his role, it is important to note the context in which he made these statements. The attempted robbery and murder occurred on December 4, 2009, and the crime was not immediately solved. On October 28, 2011, nearly two years later, Mark confessed to Modesto Police Officer Bohanan, and said he committed the attempted robbery and fatally shot the clerk.[3]

On November 8, 2011, defendant was taken into custody by the Stanislaus County Sheriff's Department, apparently because of Mark's statements. Detective Hatfield

---

[2] In denying defendant's petition for resentencing, the trial court admitted the recording and transcript of defendant's interview, and the transcripts for his preliminary hearing, the hearing on defendant's unsuccessful motion to strike the felony-murder special circumstance, his plea and sentencing hearings, and the hearing on defendant's petition for relief. This evidence addressed the initial investigation into the murder, Mark's arrest and a brief summary of his confession, and the date of defendant's arrest and his interview.

[3] At the preliminary hearing, Officer Bohanan testified about his arrest of Mark, and Mark's admission that he committed the attempted robbery and murder. The instant record does not contain any evidence about what Mark said regarding defendant's role and participation in the attempted murder and robbery.

2

advised defendant of the warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S.436, and he agreed to answer questions. At the beginning of the interview, Detective Hatfield asked general questions about his background, and defendant did not make any admissions or refer to murder. Hatfield then told defendant that Mark was already in custody "for something." Mark said defendant was with him "at the time this something happened," and Mark "blamed" defendant "as the bad guy."

Hatfield said he knew defendant was with Mark because of the video surveillance and an "eye witness."[4] Hatfield told defendant he was talking about a murder, Mark told them "everything," Mark was "putting the gun in [defendant's] hands," and Mark said defendant was "the one that pulled the trigger that killed this guy."[5]

Hatfield said the video did not show what happened inside the store, and he needed to know if defendant was or was not the shooter. Hatfield did not think he was the "bad guy" and thought he was more of a follower, particularly when he compared their respective criminal records, and asked him what happened in the store.

Defendant immediately responded, "I'm not a killer or anything," and said that Mark "was just trying to convince me and told me I should go in there. I didn't really want to do it." Defendant then launched into the narrative where he repeatedly downplayed his role in planning the robbery and his knowledge about how it would occur, said Mark planned everything, and painted himself as a reluctant actor. Nevertheless, he admitted that he was involved in planning and carrying out the crimes.

---

**4** Detective Hatfield's reference to an eyewitness was likely to Mark, or perhaps to someone at a taco truck that was parked near the store. Later in the interview, defendant said a taco truck was by the store, they might have bought something from the taco truck before they went into the store, and they ran past the taco truck as they escaped after Mark shot the clerk.

**5** Detective Hatfield's use of deceptive comments during the interview – that Mark said defendant was the gunman and the "bad guy" – was not the type reasonably likely to procure an involuntary statement. (See, e.g., People v. Jones (1998) 17 Cal.4th 279, 298–299; People v. Linton (2013) 56 Cal.4th 1146, 1176–1177; People v. Williams (2010) 49 Cal.4th 405, 443–444; People v. Smith (2007) 40 Cal.4th 483, 505.)

At the end of the interview, he asked Detective Hatfield, "You guys think I pulled the trigger?" Hatfield said no, and then revealed that Mark confessed he fired the fatal shots.

As noted by the majority opinion, the trial court's factual findings are reviewed by this court for substantial evidence. (*People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1085, 1087, 1091; *People v. Clements* (2021) 60 Cal.App.5th 597, 618, review granted Apr. 28, 2021, S267624.) "Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt. [Citation.]" (*Clements, supra*, at p. 618.)

Defendant's repeated attempts to minimize his participation must be considered in the context of being told at the beginning of the interview that Mark blamed him as the "bad guy" who murdered the clerk. The trial court reviewed the entirety of defendant's statements and found he was a major participant who acted with reckless indifference. In making these findings, it is reasonable to conclude the court rejected the credibility of the self-serving aspects of defendant's statements, when he tried to portray himself as a reluctant and minor participant in the planning and execution of the robbery. (See, e.g., *In re McDowell* (2020) 55 Cal.App.5th 999, 1013.)

**Defendant was a major participant**

The trial court found defendant was "clearly" a major participant in the attempted robbery because he "was present and participated in the discussions and preparation preceding the attempt to rob the clerk," he took an "active and primary role in the execution of the robbery attempt," he entered the store, covered his face, and demanded the money from the clerk.

I believe the trial court's findings are supported by substantial evidence. In determining whether a party was a major participant, the court must examine "the

4

defendant's *personal* role in the crimes leading to the victim's death and weigh the defendant's individual responsibility for the loss of life …." (*Banks, supra*, 61 Cal.4th at p. 801.) A defendant who was "actively involved in every element" of the underlying felony and was "physically present during the entire sequence of criminal activity culminating in the murder" would be a major participant, in contrast to a defendant who merely sat in a car "away from the actual scene of the murder[] acting as a getaway driver to a robbery …." (*Tison, supra*, 481 U.S. at p. 158; *Banks, supra*, 61 Cal.4th at p. 802.)

Defendant admitted not just his knowledge about the gun and Mark's plan to rob a store, but his role in planning how the crime was going to be committed and discussing each person's role. Defendant knew Mark and his brother intended to commit a robbery before he left Merced with them. Defendant knew Mark and Michael obtained a gun a week earlier from Michael Nava, a Norteño gang member who was a cousin of Salvador Pental; Pental was defendant's brother-in-law and the man who introduced defendant to Mark and Michael.

Defendant said "they showed [the gun] to me before" the attempted robbery and murder. Defendant said that on the day of the crime, Mark arrived at his Merced home around 6:00 a.m. or 7:00 a.m., "and he just, like, 'Come with me to Modesto.' " Defendant asked why, and Mark said "all this crazy stuff and, you know, I didn't really want to do it, but I was still, like, trying to agree with it," and he was hoping Mark would drop the topic, "but he didn't." Defendant said he sat in the backseat of their car, Mark was in the front seat, and Michael drove them to Modesto.

Defendant knew he could not deny being in Modesto since Detective Hatfield said he had video footage and Mark already blamed him for the murder. Instead of denying his presence or involvement, defendant insisted he went to Modesto against his will and refused to hold the gun. It is noteworthy, however, that defendant never said that Mark used force, threats, coercion, or produced his gun to make defendant leave his residence in Merced, get into their car, and go to Modesto with them.

5

Defendant admitted his participation in planning the crime when they reached Modesto. Defendant said Michael parked the car down the street from the store, and they stayed in the car "an hour or two" and "[m]aybe even more than two hours," while they "were just trying to figure out who was going to go in there, like, Michael didn't want to go in there, and they were trying to get me to go in there. And they wanted me to hold the gun, and I was like, 'I really don't want to do this man,' like, 'I just want to go home.' [¶] But they told me, like, I can't go back home anymore, like, I'm already there."

Defendant's claims of being a reluctant participant are undermined by his own version of what happened. As with his decision to willingly get into their car and travel to Modesto, defendant never claimed that Mark or Michael displayed the gun or used force, coercion, or threats to keep him in the car during or compel him to participate in the robbery. Indeed, defendant failed to explain why the brothers said he was even needed to commit the robbery. Michael could have stayed in the car while Mark went in the store and performed the crime, or defendant could have demanded to remain in the car as the getaway driver while Michael and Mark committed the robbery.

At any point during the one to two hours that defendant was sitting in the parked car in Modesto, defendant presumably could have left and literally walked away from the entire scheme. Instead, defendant stayed in the car and participated in their conversations about planning the crime; he never demanded to be the getaway driver or suggested that Mark and Michael could commit the crime without him; and he agreed to go into the store. These logical gaps in defendant's story suggest that he may have been a willing actor from the beginning.

Next, defendant said he got out of the car with Mark, and they went into the store "less than an hour" after leaving the car.[6] Defendant said he was talking with Mark

---

[6] When defendant said Mark arrived at his house at 6:00 or 7:00 a.m. on the day of the crime, Detective Hatfield asked if they were in Modesto all day. Defendant said no, and Hatfield replied that the murder did not occur until late afternoon.

6

during that time, and Mark "wanted me to hold the gun and stuff, and I was telling him, 'No, man.' I told him, like, I kind of want to go home, but he told me no." Defendant said he did not really want to do it, and he thought Mark was "bluffing," and he would "drop it" once they got to the door.

Thus, by defendant's own account, he spent additional time discussing the plan with Mark, beyond the two hours in the car when he talked with the brothers about each person's role. He did not tell Mark that he was going back to the car or walk away from him. Again, defendant never claimed that Mark threatened him with the gun or coerced him to go into the store.

Defendant said that he prepared to commit the robbery by covering his face. When asked if he pulled up his T-shirt, defendant said he used a "separate shirt" that he put over his face – a detail that implies he may have brought the item with him for this very purpose.[7] While he said Mark "talked me into" entering the store, and he insisted Mark held the gun, he never said that he told Mark not to use the gun or made sure it was not loaded. Defendant also admitted that when they entered the store, he was the person who told the clerk, " 'Give up the money,' " again showing that he agreed to the plan proposed either in the car or while they walked to the store, that he would make the robbery demand while Mark held the clerk at gunpoint.

Defendant said the clerk did not comply with his demand for money, admitted that Mark shot the clerk almost immediately, and the clerk sagged against the counter. They both ran out of the store, headed back to the car, and Michael drove them to Merced.

Defendant's statement that several hours passed between their arrival in Modesto and the murder is not inconsistent with the few facts in the record about the crime. Detective Hatfield testified at the preliminary hearing that he arrived at the store to investigate the murder around 3:15 p.m., and other deputies were already on the scene. Defendant's version of the timeline raises the possibility they were in Modesto for a longer period of time.

[7] At the preliminary hearing, Detective Hatfield testified about defendant's interview without reference to the transcript and testified that defendant said that "he wore two separate shirts so he could put one up over his face."

7

Defendant not only failed to aid the wounded clerk, but he followed through with the rest of the plan to destroy his clothes and not to say anything.

Defendant's self-serving claims of reluctance should be considered in the context of his narrative response to Detective Hatfield, that he was not the "bad guy" who fatally shot the clerk, along with his admissions about his role in planning the robbery. Defendant effectively admitted he did not do anything to minimize the risk of violence. He was not forced to enter the store and could have insisted that he remain in the car as a getaway driver. Even given his version of events, he could have agreed to go into the store with an unloaded gun and maintained control of it as a precaution against whatever Mark planned to do.

I would thus find defendant's statements, considered in the context of trying to convince Detective Hatfield that he was not the "bad guy" who committed the murder, support the trial court's finding that he was a major participant, and the court's implied rejection of the credibility of his statements to portray himself as a reluctant actor who was drawn into a robbery against his will. Indeed, the record raises the strong inference that defendant was instrumental in planning and perpetrating the attempted robbery that led directly to the clerk's murder and was far more of a willing and active participant than he wanted to admit.

**Reckless indifference**

The trial court also found defendant acted with reckless indifference because "he was subjectively aware of the grave risks involved in moving forward with the robbery;" he was familiar with Mark and Mark's description of his prior criminal activities; he knew about and saw the gun before the crime; he participated in the planning stages of the crime; he was physically present; and he was not "an uninformed participant or passive bystander."

"[The] factors demonstrating [the defendant's] role as a major participant are highly relevant to the analysis of whether he acted with reckless indifference.

8

[Citations.]" (*In re Loza* (2017) 10 Cal.App.5th 38, 52–53.) "[T]he greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life." (*Tison, supra*, 481 U.S. at p. 153.) As already explained, I believe there is substantial evidence to support the trial court's finding that defendant was a major participant based on his own admissions that he actively participated for a substantial period of time in discussing how the robbery would be performed and each person's role, he knew about the gun and how they obtained it, he entered the store as part of the robbery team, he covered his face to hide his identity, and he followed the plan to order the clerk to turn over the money.

I also believe the trial court's findings on reckless indifference are supported by substantial evidence. "[W]here … a defendant's 'culpability for [the] murder resides in his … role as planner and organizer, or as the one who set the crime in motion, *rather than in his … actions on the ground in the immediate events leading up to [the] murder*,' the plan must have some aspect 'that elevated the risk to human life beyond those risks inherent in any armed robbery.' [Citation.]" (*In re Taylor* (2019) 34 Cal.App.5th 543, 557, italics added.) However, both the United States and California Supreme Courts have "stressed the importance of presence to culpability…. Proximity to the murder and the events leading up to it may be particularly significant where … the murder is a culmination or foreseeable result of several indeterminate steps …." (*Clark, supra*, 63 Cal.4th at p. 619.) "In such cases, 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state…. [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murder[]. [Citation.]" (*Ibid*.)

As for the factors stated in *Clark*, defendant knew Mark had procured a gun a week earlier from a known Norteño gang member, who was related to defendant's

9

brother-in-law, the person who originally introduced defendant to the Burgess brothers. While defendant repeatedly insisted that he refused to carry the gun, he never explained why he did not demand to wait in the car and act as the getaway driver. Instead, he walked to the store with Mark and spent additional time discussing how to commit the robbery and their respective roles. Defendant effectively admitted that he participated in planning the actual robbery and his own role: They would enter the store, Mark would hold the gun, and defendant, who had taken care to cover his face before entry, would make the demand for money.

The majority finds "no aspect of defendant's participation in the crime was shown to have 'elevated the risk to human life beyond those risks inherent in any armed robbery.' [Citation.]" (Maj. opn., *ante*, at p. 19.) To the contrary, there was obviously an extensive discussion between Michael, Mark, and defendant in the car, and then between Mark and defendant as they walked to the store, about their respective roles to commit the robbery. Defendant never insisted they leave the gun in the car, use an unloaded weapon, or extract a promise from Mark not to use lethal force. Instead, he was only concerned with his own culpability and refused to carry the gun himself.

The majority opinion characterizes my disagreement as faulting defendant for not dissuading Mark from attempting the robbery in the first place and cites to cases that reject focusing on what an accomplice could have done once a crime was in progress. (Maj. opn., *ante*, at p. 19.) My conclusion on reckless indifference is based on defendant's own admissions about the fairly lengthy discussions he had with Mark about how the robbery was going to be committed. While planning or participation may not be sufficient by itself to show reckless indifference, those factors cannot be discounted in a case where the defendant had numerous opportunities to eliminate the significant risk of death that his planning and participation created, and then directly participated in the crime. The duration of the attempted robbery and murder was clearly short, but defendant had a substantial period of time to try to restrain the crime and minimize the

10

risk of violence before the crimes were committed.  Defendant was physically present during the entirety of the primary planning and the crimes themselves, from "start to finish" (*Parrish, supra*, 58 Cal.App.5th at p. 544), covered his face, delivered the robbery demand while Mark held the clerk at gunpoint, and did not try to help the clerk after Mark shot him twice.

The majority acknowledges that defendant believed Mark had once been accused of murder but minimizes the impact of his knowledge about Mark's background and possible criminal past because defendant did not have personal knowledge of the surrounding facts and believed the murder allegation was unfounded and concludes "the evidence does not show [Mark] was a person 'known to [defendant] to use lethal force.' [Citation.]"  (Maj. opn., *ante*, at p. 17.)

I again respectfully disagree with accepting the credibility of defendant's statements on this point.  Defendant knew Mark and Michael "were not peaceable or cautious."  (*Parrish, supra*, 58 Cal.App.5th at p. 544.)  Defendant said he met Michael first, after he "got out" of prison, and he later met Mark "right when he got out of prison."

Defendant admitted he had more than a passing acquaintance with Mark, because Pental "used to always bring [Mark] around, and he'll stay with us for a little bit because he had nowhere else to stay."  Defendant said Mark "told me all kinds of stuff," that "[h]e fought some murder case in Arizona," and "I guess he beat it and he came down here" with Michael.  Defendant gave conflicting explanations about why he believed that Mark, Michael, and "some more family members" were arrested but not convicted of the murder charge – defendant "guess[ed]" that Mark "beat it," but also said there was "a false imprison[ment] or something," Mark was "framed," and/or there was possibly a "[w]rong identity."

While defendant may have believed Mark was not convicted of a murder in Arizona, these explanations are far from a ringing declaration that Mark and his brother

11

were law abiding citizens. Defendant knew both brothers had been in prison, and they continued to engage in criminal activity because they procured the gun from Pental's cousin, a known Norteño gang member. Defendant admitted that Mark said "all this crazy stuff" when he arrived at his home that morning and told him about the planned robbery. The entirety of defendant's knowledge about Mark and Michael should have given him pause to realize they were planning a violent crime and not a petty offense, such as defendant's previous commission of a "beer run."[8]

As the trial court found, defendant was not "an uninformed participant or passive bystander." He had the opportunity to try to prevent the crime, and he was in a position to minimize the risk, but instead chose to facilitate it by placing the gun in Mark's hands. There is substantial evidence that he was subjectively aware of the grave risks of moving forward with the robbery with Mark and Michael.[9]

---

[8] At the beginning of the interview, before learning that he was being questioned about a murder, defendant told Detective Hatfield that he committed a "beer run" at a store "not too long ago," he took two "30-packs," and he was caught.

[9] In support of the conclusion that there is insufficient evidence of the reckless indifference element, the majority relies upon cases where the defendants were peripheral actors who were either getaway drivers, involved in planning the felonies but not present for the killings, or took steps to ensure the absence of lethal force. "In cases where lethal force is not part of the agreed-upon plan, absence from the scene may significantly diminish culpability for death. [Citation.] Those not present have no opportunity to dissuade the actual killer, nor to aid the victims, and thus no opportunity to prevent the loss of life. Nor, conversely, are they in a position to take steps that directly and immediately lead to death …. [Citation.]" (Banks, supra, 61 Cal.4th at pp. 803, 805–807, fn. 5 [the defendant was a getaway driver for an armed robbery, he was not present at the scene, and there was no evidence about his role in planning the robbery or that he could have prevented the shooting]; see, e.g., Scoggins, supra, 9 Cal.5th at p. 683 [the defendant planned an unarmed assault and robbery, his accomplices deviated from the plan and shot the victim, and defendant did not know they were likely to use lethal force]; In re Taylor, supra, 34 Cal.App.5th at pp. 557–559 [the defendant planned after-hours robbery, did not supply the gun, served as getaway driver, stayed in the car, could not see the shooting, and left the scene only when he saw help was coming]; In re Ramirez (2019) 32 Cal.App.5th 384, 404–405, 408, fn. 12 [the defendant did not plan the robbery, provided the gun at a time when no crime was contemplated, was not present for the murder, and helped with the getaway]; In re Bennett (2018) 26 Cal.App.5th 1002, 1019–1020, 1023–1026 [the defendant was a planner and driver for the robbery but not at the murder scene and did not know if anyone was hurt]; In re Miller (2017) 14 Cal.App.5th 960, 964–965, 975, [the defendant spotted the robbery target but

**Conclusion**

Despite having an extended opportunity to reflect on what was being planned and walk away from the entire enterprise, defendant ignored the risks involved in committing a robbery with Mark, even though it was reasonable for him to believe both Mark and Michael had been involved in previous violent behavior. Defendant insisted that he refused to hold the gun to rebut Mark's alleged attempt to blame him for the murder but admitted that he agreed to commit the crime and participated in the planning discussions. Defendant failed to take any steps to minimize the risk of death or injury, such as insisting they use an unloaded gun, leave the weapon in the car, or ask Mark not to use lethal force. Defendant willingly chose to cover his face, confront the clerk, and demand money while Mark pointed the gun. After Mark fired the fatal shots, defendant did not do anything to summon aid or assist the wounded clerk, choosing instead to flee with Mark and get back into Michael's waiting car.

For these reasons, I would find the trial court's findings that defendant was a major participant who acted with reckless indifference to human life are supported by substantial evidence and affirm the court's denial of defendant's petition for relief.


POOCHIGIAN, Acting P.J.

---

was absent from the murder scene and was unaware a gun would be used].) None of these cases involved a defendant who participated over a substantial period of time in planning a robbery, had opportunities to extract himself from the plan, entered the store and demanded money, and was present when his compatriot shot and killed the store clerk.

13